Chief Judge Kaye
(dissenting). Like the courts below, I would grant defendants summary judgment because plaintiffs failed to tender the outstanding storage fees and demand return of their goods. That is clearly the better, and correct, result in the present circumstances — where the commercial warehouseman was the sole bidder, bought the 60,000 yards of ultra cashmere at a price less than the value of the lien and, even after the sale, itself retains the goods.
This is the first case in which we are called upon to construe *177 UCC 7-210. It is not, however, the first case in which a warehouseman is accused of conducting a warehouse sale improperly, and therefore misappropriating plaintiffs’ goods. Such cases arose under General Business Law § 118, the predecessor to UCC 7-210 (see e.g. Lake v Dye, 232 NY 209 [1921]; Maritime World Corp. v Grefe Steel Warehouse Corp., 154 NYS2d 684 [Sup Ct, Trial Term, NY County 1956]). As those cases illustrate, courts likened the bailor’s cause of action to a claim for conversion, although that term did not appear in General Business Law § 118 (see Lake, 232 NY at 212; Maritime, 154 NYS2d at 685). They did so because they recognized the cause of action as one based on an alleged interference with an owner’s right to possess personal property, even when aspects of the interference arose within a statutory framework.
As those cases further illustrate, courts assessing the conduct of warehouse sales routinely drew on the common law to fill gaps in the existing legislative scheme. For example, in Lake we used common-law precedents to determine the measure of damages. We also recognized that while the statutes creating warehouse sale procedures were enacted in derogation of the common law, it would be “unreasonable” to expect warehouse-men advertising such sales to list the items offered in as much detail as the bailors inevitably wished. And we brushed aside a bailor’s arguments based on a discrepancy between the warehouse sale date on the notice to her and the date on the public announcement — for we recognized that this discrepancy did not harm the plaintiff under the circumstances. In short, we construed the statute with sensitivity to commercial reality. And we did so with considerably less statutory encouragement than we have today — for unlike UCC 7-210, General Business Law § 118 did not explicitly authorize courts to apply a rule of reason to any aspect of a disputed warehouse sale.
UCC 7-210 departs from its predecessor, General Business Law § 118, in several respects. First, it provides a simplified procedure for warehouse sales when the bailor is a merchant, and permits such sales to be conducted “on any terms which are commercially reasonable” (see UCC 7-210 [1]). Second, it permits a warehouseman conducting a public warehouse sale to buy the goods (see UCC 7-210 [4]). Finally, it provides for a lesser level of damages in case of nonwillful violation of the statutory sale procedures (see UCC 7-210 [9]). Each of these provisions differs from previous law, as the 1955 Report of the Law Revision Commission observed (see 1955 NY Legis Doc No. 65 [H], at 43-44). Their cumulative effect is clearly to liberalize the law to the advantage of warehousemen.
*178 In adopting these procedures, the drafters doubtless anticipated cases in which a warehouseman would sell bailed goods to a third party to satisfy a lien — as was already possible under General Business Law § 118 — and cases in which the warehouseman would buy the goods at a public sale and resell them, or even possibly utilize them. Here, however, the warehouseman has bought the bailed goods, and has neither sold them nor done anything else with them. In these unusual circumstances, we look to related statutory provisions and the common law for guidance.
Article 1 of the UCC sets forth the Legislature’s intention for the statute to be construed to promote the continued expansion of commercial practices; presumes a general obligation of good faith; and leaves intact principles of law and equity not displaced by particular provisions of the statute (see UCC 1-102, 1-103). More specifically, in reviewing a claim under UCC 7-210 we may consider how this section relates to the remainder of article 7 and — where article 7 is silent — the common law.
Under UCC 7-403, a warehouseman generally must deliver bailed goods to a person entitled to the goods under a warehouse receipt, but is excused from doing so if — among other possibilities — the claimant fails to satisfy the bailee’s lien upon request (UCC 7-403 [2]) or the warehouseman establishes “previous sale or other disposition of the goods in lawful enforcement of a lien * * *” (UCC 7-403 [1] [c]). Thus, the design of UCC 7-403 contemplates that a lawful warehouse sale may be asserted as a defense under that section when a bailor claims a warehouse has wrongfully withheld goods. It also presupposes that bailors want to possess their goods and will seek to reclaim them from the warehouse if they are still available. UCC 7-210, with its procedures for the conduct of warehouse sales, should be construed to harmonize with this provision.
As commentators have recognized, UCC 7-210 is part of an integrated statutory scheme, to be read in pari materia with UCC 7-403:
“Section 7-210 (1) and (2) set forth procedures whereby the warehouseman may foreclose its lien through sale of stored goods. These procedures are designed to protect the owner or other claimant’s right to redeem the goods (7-210 (3)) as well as to secure the likelihood that a fair price will be real *179 ized from the sale foreclosing the warehouseman’s specific lien. The warehouseman is not to sell more goods than reasonably necessary to satisfy the warehouseman’s claims. Further, 7-403 (1) (c) provides that a proper foreclosure sale gives the warehouseman a lawful excuse for non-delivery of the goods sold. The warehouseman must, however, account for any surplus from the sale proceeds under 7-210 (6)” (3 White and Summers, Uniform Commercial Code § 28-6, at 314 [Practitioner’s 4th ed] [emphasis added]).
As the emphasized language recognizes, a violation of UCC 7-210 may take away whatever “lawful excuse” a warehouseman would otherwise have had for nondelivery under UCC 7-403. And, of course, most warehouse sales will result in the goods’ passing into the hands of a third party who will hold them “free of any rights of persons against whom the lien was valid” (UCC 7-210 [5]), rendering delivery of the goods by the warehouseman impossible and demand by the bailor futile.
But UCC 7-210 was not intended to obviate a request for the goods when circumstances overwhelmingly suggest that their return is possible and would occur immediately upon tender. Under these circumstances, plaintiffs generally should be required to demand the goods, regardless of whether they style their claims as negligence or conversion (see I.C.C. Metals v Municipal Warehouse Co., 50 NY2d 657, 660-662 [1980]; Schwartz v Capital Liquidators, Inc., 984 F2d 53, 54 [2d Cir 1993]). In a situation such as the one before us, requiring demand would discourage meritless lawsuits by ensuring that bailor-plaintiffs consider their goods to be worth at least the amount of the lien. Had plaintiffs tendered the outstanding fees to the warehouseman, I suspect they would have had their fabric instead of a decade of litigation, and now the prospect of more litigation.
Judges Smith, Levine, Wesley, Rosenblatt and Graffeo concur with Judge Ciparick; Chief Judge Kaye dissents and votes to affirm in a separate opinion.
Order modified, without costs, and case remitted to Supreme Court, New York County, for further proceedings in accordance with the opinion herein and, as so modified, affirmed.